In the Matter of Michael James KINNEY, Debtor.

Chris C. LARIMORE, as Trustee of the Estate of Michael James Kinney, Plaintiff,

v.

Michael James KINNEY, Individually and d/b/a Kidney Treatment Center, Renal Care, Inc., Our Lady of Belle-Fonte Hospital, Inc., Gerald E. Benzinger, J. Robert Lyons, Jr., Defendant.

Bankruptcy No. 81–1962.
Adv. No. 84–154.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Sept. 25, 1985.

Douglas A. Wallace, Bradenton, Fla., for plaintiff.

Domenic L. Massari, Tampa, Fla., for defendants, Michael James Kinney, Robert Lyons, Jr., and Renal Care, Inc.

Robert G. Steven, Covington, Ky., for defendant, Our Lady of Bellefonte Hosp.

Gerald E. Benzinger, Covington, Ky., pro se.

J. Robert Lyons, Jr., Lexington, Ky., pro se.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Bankruptcy Judge.

THIS IS a Chapter 7 case and the matter under consideration is a complaint filed by the Trustee, seeking to set aside an allegedly fraudulent transfer under Kentucky law. The complaint contains two counts. Count I of the complaint seeks to set aside the allegedly fraudulent transfer of certain assets of a West Virginia corporation, Renal Care, Inc., to Michael James Kinney, (Debtor) a medical doctor specializing in nephrology. Count II of complaint seeks to set aside a subsequent transfer of the same assets from the Debtor to Our Lady of Bellefonte Hospital, Inc., a Kentucky corporation, or, alternatively, to compel turnover to the Trustee of the proceeds of the transfer which are presently held in escrow by Gerald E. Benzinger and J. Rob-ert Lyons, Jr. Count II of the complaint has been dismissed without prejudice pending a resolution of the issues raised in count one of the complaint. The immediate matter under consideration, therefore, is Count I of the complaint and the sole issue to be determined is whether there was a fraudulent transfer to the Debtor of some, or all, of the assets of Renal Care, Inc. and, in turn, a transfer to Our Lady of Bellefonte Hospital, Inc. (Our Lady).

The claim of the Trustee is based on the allegation that the Trustee is a judgment creditor of Renal Care, Inc. by virtue of a final judgment granted by this Court entered on October 26, 1982 against Renal Care; that the transfer under consideration was avoidable by the Trustee as a judgment creditor as a fraudulent transfer under the laws of Kentucky. The judgment of the Trustee arises out of an action filed by the Trustee against Renal Care, Inc. instituted in order to collect a debt owed to the estate for money loaned to Renal Care, Inc. by the Debtor. The Trustee has attempted to levy upon the assets of Renal Care, Inc., but having found none, now seeks to set aside the above-described transfer so that he may levy on the property allegedly fraudulently transferred after the property was recovered.

The facts relevant to a resolution of this controversy, as they appear from the record, may be summarized as follows:

Renal Care, Inc. was incorporated under the laws of West Virginia by the debtor. The corporation was formed for the purpose of conducting business as a kidney dialysis treatment facility. Originally, the Debtor was the sole stockholder, sole director and president of Renal Care but later transferred his stock to a revocable trust and resigned all positions held by him in Renal Care.

The trustee under the trust agreement set up by the Debtor was the Debtor's personal attorney and one Miss Maloney was hired and appointed to serve as president of Renal Care.

At the time Miss Maloney was hired, Renal Care had not yet begun operations and had not yet located a site for the facility to be used for the operation planned to be conducted by Renal Care. A facility was eventually located and the Certificate of Need, which is critical to the operation of a dialysis facility was obtained by Renal Care. The offices which housed the facility were not suitable as they originally stood. Therefore it appeared to be necessary to expend an additional $30,000 to $40,000 on remodeling the facility. The facilities were leased by Renal Care and there is no dispute that all improvements were paid for by Renal Care. It should be noted that the Debtor's medical practice was located in the building occupied by Renal Care, although the offices were physically separated. It is equally without dispute that the vast majority of Renal Care's clients were also patients of the Debtor.

It is the Trustee's contention that, after the entry of this Court's final judgment obtained against Renal Care, the Debtor, Miss Maloney and the Trustee under the trust agreement, caused all the assets of Renal Care to be transferred to the Debtor in order to frustrate the Trustee's attempts to levy on the assets of Renal Care and to collect the judgment.

The evidence presented does not support the Trustee's contention. On the contrary, it supports the Debtor's contention that Renal Care ceased doing business in September, 1982, or before the entry of the judgment; that the Debtor started a new and completely separate business from the previous business of Renal Care, Inc. thereafter under the name Kidney Dialysis Treatment Center (KDTC). Therefore, under the applicable law of Kentucky, the transfer was not voidable as a fraudulent transfer.

The relevant facts, as appear from the record, leave no doubt that the business of Renal Care was unprofitable from its inception. Due in large part to the lack of an economical water supply, cost of operation became excessive and, combined with poor economies of the area, led to the downfall of Renal Care. As the result, in the later part of September 1982, the lessor of Renal Care's offices was threatening eviction for non-payment of rent; suppliers were no longer willing to extend credit to Renal Care but were demanding cash on delivery; the lessors of the dialysis machines were threatening to repossess the machines because of default by Renal Care. The former president of Renal Care testified that during this period there were constant discussions about discontinuing the operations. Both Renal Care's patients and the Debtor as their physician became seriously concerned about the viability of the operations of Renal Care.

Because of the foregoing dismal prospects for the future, in late September, 1982 Renal Care was forced to close its doors. The Debtor, because of his concern about the continuing treatment of his patients, on October 1, 1982 formed KDTC in order to assure the continued availability of a kidney dialysis facility for the region. Although the Debtor had previously indicated January 15, 1983 as the date he started KDTC, this appears to be incorrect and appeared to have been an oversight based on the fact that January 15, 1983 was the date the official governmental approval was given for KDTC to operate as a dialysis treatment facility. However, the date of official governmental approval was not the actual date when the dialysis facility started operation. The record reveals that it is customary for a facility to be in operation prior to actually receiving a Certificate of Need. In the case at hand, it appears that KDTC, which was located in the offices previously used by Renal Care, operated initially under the Certificate of Need of Renal Care until it obtained its own Certificate of Need. It appears that the authorities were aware of the operation of KDTC and that they approved it while the application of KDTC for a new Certificate of Need was being reviewed.

It should be noted at the outset and it is axiomatic that before the Trustee can prevail on its claims, he must first prove that

there was indeed a transfer of assets from Renal Care to the Debtor. If the Trustee can not prove that the Debtor himself received any asset of Renal Care, then the issues of fraudulent intent, lack of adequate consideration, etc. are immaterial.

The following is a summary of the assets which the Trustee contends were transferred.

(1) the leasehold on the property in Ashland, Kentucky and the valuable lease hold improvements which were essential to the operation of the premises as a dialysis facility.

(2) the lease on the equipment which the Debtor used for a brief period of time.

(3) the accounts receivable of Renal Care, totalling in excess of $60,000.00 which the Debtor appropriated to his own benefit.

(4) the value of the facility itself as a going concern such as its prior qualification as a kidney dialysis facility through the Certificate of Need process and its established roster of patients

(5) an undetermined amount of consumable supplies

(6) miscellaneous furniture, furnishings, and equipment.

As noted, the first assets claimed to have been transferred were the leasehold improvements installed by Renal Care in order to accommodate Renal Care. It is without dispute that $30,000.00 to $40,000.00 worth of modifications were, in fact, made to the leased premises before Renal Care could start operations. Clearly, the modifications were of value, so long as they were used by Renal Care. It is clear, however, that they could not have been removed and sold elsewhere since they were built-in items, thus, fixtures part of the premises. Thus, when Renal Care ceased its operations in September, 1982, the leasehold improvements no longer were of any value to Renal Care because they could not longer be used nor could they be removed and sold by Renal Care. The leasehold improvements were, in fact, abandoned to the next occupant when Renal Care vacated the premises.

The Trustee also contends that the Debtor received the valuable lease of the dialysis equipment used by Renal Care in its operation. This contention is not supported by the record. The Debtor did not assume these leases, but rather, replaced the equipment as soon as was practical. During the short time that the dialysis machines previously leased by Renal Care were used by KDTC, it appears that the equipment lessor was informed of their use and, in fact, encouraged it but did not agree to any assumption of the lease. In addition, no evidence was presented which would indicate that this lease had any value. In fact, it appears that the equipment was expensive and not cost effective. Thus, the lease appeared to be more of a liability than an asset. In any event, the lease was not transferred to KDTC.

Next, it is the Trustee's contention that the Debtor took control of accounts receivable of Renal Care in excess of $60,000. A review of the record indicates that except for a very small undetermined amount, all of the receivables claimed to have been appropriated by the Debtor were for services performed after October 1, 1982 by KDTC and not by Renal Care. Although several checks received were made out to Renal Care, they represented payment for services rendered by KDTC and they were deposited by KDTC in its own account.

In explanation of the reason for handling the receivables in this fashion, the Debtor offered the following:

Upon applying for and receiving a Certificate of Need, a facility is entitled to reimbursement from both Medicare 80% and from the state issuing the Certificate of Need 20% of the cost of the patient's treatment. A patient in need of dialysis treatment is automatically entitled to have his or her bills for the treatment picked up as outlined above. Because of the extremely high cost of dialysis treatment, without the payments from Medicare and the State, most patients would be unable to afford treatment. Likewise, without the reimbursement, a dialysis facility would be un-

able to operate profitably. It is these reimbursements which are presently in dispute.

From October 1, 1982, when KDTC started, until January 15, 1983, when a new Certificate of Need was officially issued to the Debtor, all checks issued by the government continued to be made out to Renal Care. As noted earlier, the Trustee contends that approximately $65,000.00 was received by KDTC for treatments rendered between October 1, 1982 and January 15, 1983 and these payments belonged to Renal Care. Therefore, as stated above, it is clear all treatments after October 1, 1982 were preformed by KDTC. Thus, regardless of to whom checks were made payable, it is clear that KDTC and not Renal Care was entitled to the funds.

The next asset claimed by the Trustee to be transferred is the value of "Renal Care" as a going concern, including the value of its Certificate of Need and patient rosters. The evidence on this point is clear that as of October 1, 1982, the going concern value of Renal Care was nil or at least nominal at best. This appears to be due to Renal Care's poor financial condition together with uncertain conditions in the kidney dialysis field. The Plaintiff cites authority for the proposition that even though Renal Care was of little or no value as a going concern on October 1, 1982, it did have some speculative or prospective value which should have been preserved for creditors. As evidence of the potential value of Renal Care on October 1, 1982, the Trustee points out the fact that KDTC was eventually sold for $300,000.00. The Trustee's position would be meritorious had KDTC been a continuation of Renal Care, Inc. but that is not the case. As pointed out earlier, KDTC was a separate entity unto itself with its own going concern value, none of which was derived from the going concern value of Renal Care, simply because it had none. Renal Care never made any profit; it was on the verge of losing its lease of the premises and its dialysis machines and its future prospects in October, 1982 were dim indeed.

The next item claimed to have been transferred is the Certificate of Need. The Trustee points out the fact that Certificates of Need are issued for a particular facility and not to an entity and that the transfer of the Certificate is expedited so long as a facility remains at the same location. From this, the Trustee concludes that Renal Care transferred to KDTC the right to expedite its application for a Certificate of Need. This is not, however, the case. Renal Care did not transfer or bestow upon KDTC the right to the expedited application because Renal Care had already ceased use of the facilities. KDTC did not continue to operate the Renal Care facility, but rather, started a new business located at the same facility previously leased by Renal Care, Inc. KDTC then applied for a new Certificate of Need and was allowed to do so on an expedited basis because it was located where a previously certified facility had been located. The agency responsible for issuing certificates of need did not need to review the need for a facility in the geographical area or other factors as they would have had no facility been operating prior to KDTC. The Certificate of Need process was expedited because of the state's ability to dispense with inquiries regarding the need for a facility, not because Renal Care, Inc. transferred that right to KDTC. In any event, under the law of Kentucky, a Certificate of Need is non-transferable. KRS § 216 B. 105 (1).

As to the patient rosters, there was conflicting testimony as to whether they were property of Renal Care, Inc. or of the patients themselves. In any event, it appears that they were of no value.

Lastly, the Trustee contends that miscellaneous furniture, furnishings, equipment and consummable supplies were transferred to the Debtor by Renal Care, Inc. From the record it appears that these items were indeed transferred to the Debtor, however, other than $200 of medical tubing, the Trustee introduced no evidence as to the value of the items transferred. There being no evidence of value other than the $200, this Court can not grant the

relief requested with regard to the furniture, furnishings, equipment and supplies.

Under Kentucky law a transfer may be avoided regardless of fraudulent intent if it is made without consideration. KRS §§ 378.010, 378.020. Other than the $200 of tubing, this Court finds that there was no transfer, fraudulent, or otherwise, and, thus, judgment should be entered for the Plaintiff to the extent of $200 and for the Defendant on all remaining issues.

A separate final judgment will be entered in accordance with the foregoing.